IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 12, 2006 Session

## MARTIN MORENO v. JOSE SERVANDO RUIZ, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 05C-208     David Randall Kennedy, Judge**

**No. M2005-02223-COA-R3-CV - Filed on March 12, 2007**

A small contractor entered into an oral agreement to install brick facades on new houses in a Mt. Juliet subdivision.  He did brickwork on eleven houses pursuant to the agreement, and was paid in cash for the work on an irregular basis.  Because he believed the other party to the agreement did not pay him in full, he walked off the job and brought suit for breach of contract.  A bench trial in Circuit Court ultimately resulted in a net judgment for the plaintiff in the amount of $397.50.  He argued on appeal that the evidence showed that he was entitled to receive over $10,000 on his claim.  We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

W.H. Stephenson, II, Nashville, Tennessee, for the appellant, Martin Moreno.

Owen R. Lipscomb, Nashville, Tennessee, for the appellees, Jose Servando Ruiz and Vincente Ruiz.

### OPINION

### I. AN ORAL CONTRACT

Martin Moreno owned a small construction business in Davidson County.  His friends Jose and Vicente Ruiz worked as contractors under the name J.R. Masonry.[1]  They were the primary masonry contractors at Willoughby Station, a large subdivision under construction in Mr. Juliet.  In

---

[1]Jose Ruiz and Vicente Ruiz were brothers and worked together in the construction business. Although both were named in Mr. Moreno's suit, Jose Ruiz testified that he was the 100% owner of the company. There was no testimony at trial as to any interactions between Vicente Ruiz and any party or witness.  Thus, any reference in this opinion to "Mr. Ruiz" means either Jose Ruiz or the construction business he operated with his brother.

May of 2004, they offered Mr. Moreno subcontracting work at Willoughby Station. The parties agreed that Jose Ruiz would tell Mr. Moreno which houses he and his workers should lay brick on, and Mr. Ruiz would pay Mr. Moreno at the rate of $285.00 for each 1,000 bricks laid.

The agreement was never reduced to writing. However, the parties do not dispute its terms, but only whether Martin Moreno was fully paid. The proof showed that Mr. Moreno would periodically tell Mr. Ruiz how many bricks his workers had laid, and Mr. Ruiz would pay Mr. Moreno in cash every two weeks for his work. The amount of such payments did not necessarily correspond to the exact number of bricks laid, but was usually a round number like $4,000 or $3,000. Mr. Moreno worked on eleven houses in the subdivision before the parties' agreement fell apart.

According to Mr. Moreno, he approached Mr. Ruiz for payment of completed work in August of 2004 and was told that Mr. Ruiz did not have the money. However, Mr. Moreno's laborers continued working, and when Mr. Moreno approached Mr. Ruiz again and told him he couldn't pay his laborers, Mr. Ruiz gave him $4,000. The next day, Mr. Ruiz paid him $2,000. Two weeks later, he paid $2,000, and the day after that he paid $1,000. Mr. Moreno believed that Mr. Ruiz still owed him for completed work, but Mr. Ruiz refused further payment, contending that he had paid everything he owed.

Mr. Moreno then complained to Robert Posner, a construction superintendent at Willoughby Station who had worked with Jose Ruiz for many years. Mr. Posner talked to both Mr. Moreno and Mr. Ruiz in an attempt to settle their dispute, but was not able to make any headway. At that time, Mr. Moreno's workers were laying brick on a house at Lot 157. When it became apparent to him that Mr. Ruiz would not pay what he believed was owed, Mr. Moreno abandoned the job, leaving the house at Lot 157 only partially bricked.

## II. TRIAL PROCEEDINGS

Mr. Moreno filed a civil warrant in the General Sessions Court of Davidson County on November 22, 2004. After a hearing, the court rendered judgment in his favor in the amount of $11,362. Mr. Ruiz timely appealed to the Circuit Court, where a bench trial was conducted on June 6, 2005.

The only witnesses to testify were Martin Moreno, Jose Ruiz, and Robert Posner.[2] Mr. Moreno testified that he worked on eleven houses under his agreement with Mr. Ruiz and that Mr. Ruiz paid him in full for six of the houses. He claimed, however, that he only received partial payment for the other five houses. To support that claim he produced photos, which purported to show the five houses in question, and a sheet summarizing the alleged shortfall. The five houses were labeled on the photos and identified in the summary sheet as Mail Box # 2010, Lot 155, Lot 758, Mail Box # 2017, and Lot 157.

---

[2]We note that Mr. Moreno and Mr. Ruiz both spoke English and that no Spanish language court interpreter was used, but they both experienced difficulty at times responding to the questions of the attorneys.

The summary sheet set out the numbers of bricks on each house which Mr. Moreno's workers had laid but for which he had allegedly not been paid (ranging from 5,500 to 34,000 bricks per house) and the price for that number of bricks at the rate of $285 per thousand. According to Mr. Moreno's summary sheet, the total payments that he should have received for the brickwork on those five houses was $22,087.50. The sheet recited total payments received in the amount of $9,000, leaving a balance due of $13,087.50.

Robert Posner testified that he had been working on the Willoughby Station subdivision for over ten years and that it included about 700 homes. He was asked if he was familiar with the lots in the subdivision, and he responded that he was and that each lot number corresponded with a street number. He acknowledged that he had brought a list of the subdivision lots with him, and was questioned as follows:

Q.    Tell us what Lot No. 155 – what the street number Lot 155 coincides with?

A.    Twenty-seventeen (2017) Arden Court.

Q.    So, twenty-seventeen (2017) Arden Court is the same thing as Lot 155?

A.    That's correct.

Q.    Any doubt about that at all?

A.    No, sir.

Mr. Posner was also asked about another house shown in one of Mr. Moreno's photographs, which was labeled Mail Box 2010. The photo showed a fully-bricked house, but according to Mr. Posner, that particular house had not been bricked at the time Mr. Moreno walked off the job. On cross-examination, he was shown the photo that was labeled Mail Box 2010, and was asked, "Does that house look familiar to you." He responded, "I really couldn't tell you sir. We've built so many like it. So, yes, I've seen that house before."

When Mr. Ruiz was called to the stand, he testified that Mr. Moreno's work was initially very good, but that after a while it deteriorated, with bricks laid out of alignment and no weep holes installed where they were needed for ventilation and drainage. Mr. Ruiz testified that where this happened, he had to drill holes and make any necessary adjustments at his own expense.

He also testified that when Mr. Moreno's crew walked off the job on Lot 157, only 15,000 bricks out of the 21,000 that had been delivered had been laid. Some of the bricks were installed in the wrong position and had to be removed so the work could be re-done. Mr Ruiz testified that the remaining bricks were dumped or destroyed, forcing him to order more brick. He testified that he lost between $3,000 and $4,000 on that house. To support his testimony, he introduced photographs of the unfinished house, with both whole and broken bricks piled around the foundation. Like Mr.

Posner, Mr. Ruiz also testified that Lot 155 and Number 2017 were different designations for the very same house.

After hearing all the evidence, the court found that Mr. Ruiz had failed to pay Mr. Moreno $13,087.50 that he owed him, but that Mr. Moreno had damaged Mr. Ruiz in the amount of $3,000 by leaving the brickwork on Lot 157 unfinished and the site in disarray. The court subtracted those damages from the sum Mr. Ruiz owed, resulting in a net judgment of $10,087.50.

Mr. Ruiz filed a Motion to Alter or Amend pursuant to Tenn. R. Civ. P. 59. He contended that the proof showed that two of the houses for which Mr. Moreno claimed payment was withheld (Lot 155 and Mailbox 2017) were in fact one and the same house and, thus, that the original judgment gave Mr. Moreno a double recovery for a single structure. The trial court then examined the trial record and concluded that Mr. Ruiz was correct. He accordingly granted the motion and filed a new judgment with detailed findings of fact, which reduced Mr. Moreno's recovery to $397.50. Mr. Moreno appealed.

### III. ANALYSIS

This case presents no legal issues to be decided and only one straightforward finding of fact to be reviewed: did Mr. Moreno receive the payment he was due under his oral contract with Mr. Ruiz? Our review of the case is controlled by Tenn. R. App. P.13(d) which states ". . . review of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." *See Limbaugh v. Coffee Medical Center*, 59 S.W.3d 73, 79 (Tenn. 2001).

There was no dispute that a contract existed and no dispute as to its relevant terms. If the parties had managed to keep accurate records, there would have been little difficulty determining the extent of Mr. Moreno's entitlement to additional payment. Unfortunately, several factors made it difficult to establish the true facts at trial: all payments by Mr. Ruiz were in cash; any record-keeping was rudimentary at best; neither party was totally fluent in English; and the subdivision was so large and the houses so similar to each other that even the developer's building superintendent had difficulty keeping them straight. As the trial court pointed out, the issues made it all the more important for the parties to keep good records.

The trial court initially credited Mr. Moreno's testimony as to all five houses he claimed he was owed for, as well as Mr. Ruiz's testimony about the damages he suffered from Mr. Moreno's failure to complete the work on Lot 157. Mr. Ruiz's Motion to Alter and Amend alleged that the court had overlooked evidence in the record which indicated that Mr. Moreno was asking to be paid twice for his work on the same house. After examining the evidence, the trial court agreed, and entered a new judgment with detailed findings of fact, which reduced the award to eliminate a duplicate recovery.

Mr. Moreno argues on appeal that the trial court's initial ruling was correct, and that there was no double recovery. He points out several weaknesses in the proof the defendant relies upon. These include Mr. Posner's inability to identify a particular subdivision house from a photo that was shown to him, and speculation that Mail Box 2017 and 2017 Arden Court might not actually be the same house, since more than one street in the subdivision might include a house bearing that number. These arguments go to the weight of the evidence, but they are not sufficiently probative or certain to totally negate Mr. Posner's testimony as to the houses in question.

Mr. Moreno used photographic and written testimony to bolster his claim that Mr. Ruiz owed him money for brickwork he had done on five houses. However, our examination of the five photos that Mr. Moreno presented shows what appears to be two photos of the same house.[3] Mr. Posner testified that two of the homes for which Mr. Moreno claimed payment were one and the same. The trial court credited the testimony of Mr. Posner and adjusted Mr. Moreno's recovery accordingly.

Where the trial judge has seen and heard witnesses, its judgment regarding their credibility and the weight to be given their testimony are accorded considerable deference on appeal. *Clark v. Nashville Machine Elevator Co. Inc.*, 129 S.W.3d 42, 46 (Tenn. 2004); *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989). Mr. Posner was the only disinterested witness in this case, and there is no suggestion from his testimony or from the arguments of the parties of any bias or improper motive on his part. Based upon our review of the entire record, we cannot say the evidence preponderates against the trial court's findings. Accordingly, we affirm the judgment.

**IV.**

The judgment of the trial court is affirmed. Remand this case to the Circuit Court of Davidson County for any further proceedings necessary. Tax the costs on appeal to the appellant, Martin Moreno.

_____
PATRICIA J. COTTRELL, JUDGE

---

[3] Interestingly, the photographs that Mr. Moreno introduced of houses 155 and 2017 show structures of similar design, but they are clearly not identical. However, the photos labeled by Mr. Moreno as houses 759 and 2010 depict the same house.